# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SUZAN MCGARY, M.D., | No. 4:12-CV-01742 |
| Plaintiff. | (Judge Brann) |
| v. | (Magistrate Judge Arbuckle) |
| WILLIAMSPORT REGIONAL MEDICAL CENTER, et al., | |
| Defendants. | |

## MEMORANDUM OPINION

### MAY 22, 2018

Defendants moved for summary judgment on all counts of Plaintiff's Amended Complaint. For the reasons that follow, that motion will be granted.

**I.     BACKGROUND**

Plaintiff Suzan McGary, M.D., performed cardiothoracic surgery at the Williamsport Regional Medical Center ("WRMC") from 1999 through 2007.[1] In January 2012, after several years practicing elsewhere, Dr. McGary sought to return to WRMC, and applied for privileges there.[2]

At that time, WRMC's credentialing policy required cardiothoracic surgeon applicants to have performed at least 100 heart surgeries and 100 lung surgeries

---

[1]   ECF Nos. 42 and 48 ¶ 18.

[2]   *Id.* ¶¶ 32, 36.

during the past year.³  In the year preceding her application, however, Dr. McGary had performed only 37 heart surgeries and 15 lung surgeries.⁴  Her application was denied.⁵

On August 31, 2012, Dr. McGary initiated the above-captioned action against WRMC, the Susquehanna Health System ("SHS"), George Manchester, M.D., Scott Croll, M.D., John Burks, M.D., and Mark A. Osevala, D.O.⁶  Her Amended Complaint alleges that WRMC's conduct surrounding the rejection of her privileges application: (1) violated Sections 1 and 2 of the Sherman Act, (2) breached a contract of which she was the intended beneficiary; (3) interfered with her prospective contractual relationships; and (4) amounted to a conspiracy in restraint of trade.⁷

Defendants moved for summary judgment on September 26, 2016.⁸  Magistrate Judge William I. Arbuckle issued a Report and Recommendation ("R&R") recommending that this Court grant that motion in part and deny it in part.⁹  Both parties, however, have objected to that R&R.¹⁰

---

3   *Id.* ¶ 37.

4   *Id.* ¶ 43.

5   *Id.* ¶ 44.

6   ECF No. 1.

7   ECF No. 10.  The Amended Complaint contained other claims, but these were dismissed by this Court on February 21, 2014.  ECF No. 22.

8   ECF No. 41.

9   ECF No. 51.

## II.	DISCUSSION

### A.	Standard of Review

Summary judgment is granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[11] A dispute is "genuine if a reasonable trier-of-fact could find in favor of the non-movant," and "material if it could affect the outcome of the case."[12] To defeat a motion for summary judgment, then, the nonmoving party must point to evidence in the record that would allow a jury to rule in that party's favor.[13] When deciding whether to grant summary judgment, a court should draw all reasonable inferences in favor of the non-moving party.[14]

This Court has the authority to refer summary judgment motions to magistrate judges for dispositional recommendations.[15] If a party objects to any

---

[10] ECF Nos. 54, 62.

[11] Federal Rule of Civil Procedure 56(a).

[12] *Lichtenstein v. Univ. of Pittsburgh Medical Ctr.*, 691 F.3d 294, 300 (3rd Cir. 2012) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 252 (1986).

[13] Federal Rule of Civil Procedure 56(c)(1); *Liberty Lobby*, 477 U.S. at 249.

[14] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).

[15] 28 U.S.C. § 636(b)(1).

portion of such a "Report and Recommendation," this Court must review that portion *de novo*.[16]

### B. Whether the Defendants Are Capable of Conspiring Amongst Themselves

Magistrate Judge Arbuckle recommended that this Court grant summary judgment to the Defendants on three of Dr. McGary's claims—*i.e.*, (1) her claim under § 1 of the Sherman Act, (2) her conspiracy to monopolize claim under § 2 of the Sherman Act, and (3) her civil conspiracy claim—because he concluded that the Defendants are legally incapable of conspiring amongst themselves.[17] Dr. McGary objected to this conclusion.

To prevail on any of the conspiracy claims at issue, Dr. McGary must show an agreement between two or more individuals or entities.[18] The law is clear, however, that such agreement must be between individuals or entities operating in their individual capacities, and not as agents of their alleged co-conspirator(s).[19]

---

[16] *Id.*

[17] ECF No. 51 at 18-23.

[18] *See American Needle, Inc. v. National Football League*, 560 U.S. 183, 189 (2010) (noting that a claim under § 1 of the Sherman Act requires proof of a "contract, combination, or conspiracy"); *Friedman v. Delaware County Memorial Hosp.*, 672 F. Supp. 171, 196 (E.D. Pa. 1987) (noting that a conspiracy to monopolize claim under § 2 of the Sherman Act requires proof of "an agreement or understanding between two or more economic entities"); *Robinson v. Magovern*, 521 F. Supp. 842, 926 (W.D. Pa. 1981) (noting that a state law conspiracy in restraint of trade claim requires proof of "a combination or agreement between two or more persons or business entities to commit an unlawful act or to accomplish a lawful objective through unlawful means").

[19] *See American Needle, Inc.*, 560 U.S. at 189 ("The relevant inquiry [of a claim under § 1 of the Sherman Act] is whether there is a 'contract, combination, or conspiracy' amongst

SHS is a nonprofit corporation located in Williamsport, Pennsylvania;[20] its Chief Medical Officer is Dr. Manchester.[21] SHS owns WRMC, as well as non-party Susquehanna Physician Services ("SPS").[22] SPS, in turn, employs Dr. Croll (as a general surgeon), Dr. Burks (as a cardiologist), and Dr. Osevala (as a cardiothoracic surgeon).[23] Because of the parent-subsidiary relationship between SHS and WRMC, and because all the individual physician defendants are employed by SHS or one of its subsidiaries, Magistrate Judge Arbuckle determined that "there [was] no combination of independent entities" capable of engaging in concerted action of the sort that creates liability under the Sherman Act or state conspiracy law.[24]

Dr. McGary objects to this recommendation. She notes that Dr. Osevala's compensation from SPS is partially performance-based—*i.e.*, he may receive more money by bringing more revenue into the hospital—and believes that his purpose

---

separate economic actors pursuing separate economic interests. . . ."); *Friedman*, 672 F. Supp. at 190, 196 (noting that a conspiracy to monopolize claim under § 2 of the Sherman Act requires the same relevant element as a claim under §1 of the Sherman Act—*i.e.*, both require an agreement between "independent economic entities"); *Rutherfoord v. Presbyterian-University Hosp.*, 417 Pa. Super. 316, 333-34 (1992) ("A single entity cannot conspire with itself and, similarly, agents of a single entity cannot conspire among themselves.").

[20] ECF No. 42 ¶ 1.
[21] *Id.* ¶ 12.
[22] *Id.* ¶ 6.
[23] *Id.* ¶¶ 13-15.
[24] ECF No. 51 at 6.

in excluding her from WRMC was to prevent her from reducing his own patient load (and paycheck). Therefore, she argues, while all the Defendants are looking out for the hospital's bottom line, Dr. Osevala is simultaneously seeking to boost his own; consequently, Dr. Osevala and the other Defendants are "separate economic actors pursuing separate economic interests."[25]

Determining whether parties are legally capable of conspiring requires "a functional consideration of how the parties involved in the alleged anticompetitive conduct actually operate."[26] It is true that Dr. Osevala's employment agreement contained an "incentive bonus" provision.[27] It is also true, however, that Dr. Osevala never qualified for that bonus, and was instead just paid his flat, regular salary. Moreover, even if he had qualified for such a bonus, that would simply show that Dr. Osevala was successful in bringing business to the hospital—*i.e.*, that he was successful, as a hospital employee, in furthering *the hospital*'s economic interest.[28] The parties, then, are, as a matter of law, "a single economic

---

[25] *American Needle, Inc.*, 560 U.S. at 189.

[26] *Id.* at 191.

[27] The agreement does not explicitly promise an specific amount of increased pay based on Dr. Osevala's achievement of objective, measurable criteria. Rather, it indicates that Dr. Osevala may receive extra compensation for "any significant, unanticipated occurrences which affect the revenues or expenses associated with [his] practice." ECF No. 48 ¶ 74. The vagueness and uncertainty of that language—*i.e.*, which "occurrences" are "significant" or "unanticipated"?—further erodes Dr. McGary's argument that Dr. Osevala was pursuing an economic interest separate from that of the hospital, since it seems far from certain that Dr. Osevala was actually *guaranteed* anything.

[28] *Cf. Weiss v. York Hospital*, 745 F.2d 786, 815 (3d Cir. 1984) (holding that a hospital's medical staff was capable of conspiring with the hospital where the staff was "a group of

entity for purposes of antitrust analysis,"[29] and cannot legally conspire. Therefore, summary judgment on the conspiracy claims will be entered in favor of Defendants.

### C. Whether Defendants Have Willfully Acquired Or Maintained Monopoly Power

To prevail on her monopolization claim under § 2 of the Sherman Act, Dr. McGary must show the "willful acquisition or maintenance of [monopoly] power"—*i.e.*, they must show that Defendants engaged in "anticompetitive conduct."[30] It is well-established, however, that "[c]onduct that merely harms competitors, . . . while not harming the competitive process itself, is not anticompetitive."[31]

Dr. McGary argues that Defendants have maintained monopoly power by "rely[ing] on onerous and outdated surgical number standards as a pretextual reason for denying surgical privileges."[32] Unfortunately, she points to no evidence in support of this argument. To the contrary, it appears that, since May 1, 2007, at

---

    doctors, all of whom practice medicine in their individual capacities,"—*i.e.*, not as employees of the hospital—"and each of whom is an *independent economic entity* in competition with other doctors in the" relevant market).

[29] *Id.*

[30] *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 308 (3d Cir. 2007).

[31] *Id.*

[32] ECF No. 49 at 34.

least seven doctors met the hospital's 100-surgery criteria and, consequently, gained surgical privileges there.[33] During that time period, in fact, Dr. McGary was the only applicant who was rejected.[34]

Because Dr. McGary has failed to demonstrate conduct that harms competition—and has, instead, only shown conduct that harms herself, a competitor—summary judgment on this claim will be granted in favor of Defendants.

**D.   Whether Defendants Had the Specific Intent to Monopolize**

To prevail on her attempted monopolization claim under § 2 of the Sherman Act, Dr. McGary must prove that Defendants had the "specific intent to monopolize the relevant product and geographic markets."[35]

Dr. McGary asks this Court to infer the requisite intent from Defendants' rejection of her surgical privileges application. This Court, however, has already concluded that the hospital's surgical privileges criteria, standing alone, cannot support a monopolization claim.[36] Consequently, the mere existence of those criteria—and Dr. McGary's failure to successfully meet them—cannot support a

---

[33]   ECF No. 42-9 (Ex. 8.2 at 9-10).

[34]   *Id.* at 11.

[35]   *Pontius v. Children's Hosp.*, 552 F. Supp. 1352, 1376 (W.D. Pa. 1982).

[36]   *See supra*, § II.C.

finding of a specific intent to monopolize. Summary judgment on this claim, therefore, will be granted in favor of Defendants.

### E. Whether Defendants Breached a Third-Party Beneficiary Agreement

Count IV of Dr. McGary's Amended Complaint—titled "Breach of Third Party Beneficiary Agreement"—alleges (1) that the hospital's bylaws created a contract between WRMC and its medical staff; (2) that Defendants' review of her privileges application was not done in accordance with the terms of that contract; (3) that privileges applicants like herself were the intended beneficiaries of that contract; and (4) that, therefore, Defendants' conduct amounted to a breach of a third-party beneficiary agreement.[37]

To prove this claim, Dr. McGary must show that the parties bound by the bylaws—*i.e.*, WRMC and its medical staff—intended to make her a beneficiary of that contract, and that such intention "affirmatively appear[s]" in the bylaws themselves.[38] Even construing the bylaws in their entirety, however, this Court cannot find that intention.[39] Further "[n]o Pennsylvania decision has recognized an applicant for staff privileges as a third-party beneficiary of the medical staff

---

[37] ECF No. 10 ¶¶ 58-64.

[38] *Robinson v. Magovern*, 521 F.Supp. 842, 925 (W.D. Pa. 1981).

[39] Ex. 3.3 to Defendants' Motion for Summary Judgment, ECF No. 42-4.

bylaws of a private hospital."[40] Therefore, this Court will grant summary judgment in favor of Defendants on this claim.

### F. Whether Defendants Intentionally Interfered with Dr. McGary's Prospective Contractual Relationships

To prevail on her claim for intentional interference with prospective contractual relationships, Dr. McGary must prove that Defendants had the specific intent of causing her harm.[41]

To prove such intent, Dr. McGary argues that "Defendants had to know that[,] by denying [her] privileges at WRMC, she would not be competing in the [local] market."[42] Accepting that argument at face value—without, however, determining if the evidence actually supports it—the most that could be said is that Defendants acted with an intent to improve their own business, not to intentionally

---

[40] *Robinson*, 521 F. Supp. at 926.

As she fleshes out this claim in her papers relating to the instant summary judgment motion, Dr. McGary appears to argue that, by submitting her privileges application, she actually became a party to the contract memorialized in the bylaws, and not just a third-party beneficiary of that contract. Even accepting this amendment of Count IV, this Court does not read the language of the bylaws as creating such a contractual relationship. Although indicating that privileges applicants "agree[] to be bound by [the bylaws'] terms [during] the time the application is under consideration," the bylaws contain no similar language creating an obligation running from Defendants to the privileges applicants. Ex. 3.3 to Defendants' Motion for Summary Judgment, ECF No. 42-4.

[41] *Phillips v. Selig*, 959 A.2d 420, 420 (Pa. Super. Ct. 2008).

[42] Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment, ECF No. 49 at 42.

harm Dr. McGary's.[43] Because no jury could find a requisite element, this Court will grant summary judgment to Defendants on this claim.

## III. CONCLUSION

For the reasons discussed above, this Court will grant summary judgment to Defendants on all counts of Dr. McGary's Amended Complaint. An appropriate Order follows.

BY THE COURT:

*s/ Matthew W. Brann*
Matthew W. Brann
United States District Judge

---

[43] *Cf. Glenn v. Point Park College*, 441 Pa. 474, 479, 481-82 (1971) (where complaint alleged that real estate purchasers negotiated directly with real estate sellers instead of going through plaintiff-brokers, "thus depriving plaintiffs . . . of their commission," holding that this allegation "comes close to charging an intent to cause harm to plaintiffs [but] stops short of doing so").